### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| IN RE: | SCOTT KORN, | : | Chapter 11 |
| | | : | |
| | Debtor. | : | Bky. No. 14-13138 ELF |

# O P I N I O N

## I. INTRODUCTION

In this individual chapter 11 bankruptcy case an unsecured creditor, has filed a "Motion for an Order Directing the Appointment of a Chapter 11 Trustee or Examiner or the Conversion of the Case" ("the Motion"). The debtor contests the Motion.

During the course of the litigation of this contested matter, all parties agreed that neither the appointment of a trustee nor dismissal of the case is appropriate. Thus, the issue is whether the case should be converted to chapter 7 or remain in chapter 11 to permit the debtor the opportunity to confirm a plan of reorganization.

For a variety of reasons, the creditor maintains that "cause" exists under 11 U.S.C. §1112(b)(1) for conversion of this case to chapter 7. The debtor disputes this, but contends alternatively, that even if "cause" exists, "unusual circumstances," within the meaning of 11 U.S.C. §1112(b)(2) are present and that it is in the best interests of creditors that this case remain in chapter 11.

As explained below, I conclude that cause exists for the relief requested under §1112(b)(1) and that the debtor has not established the existence of unusual circumstances within the meaning of §1112(b)(2). Accordingly the Motion will be granted and this case will be converted to chapter 7.

## II. PROCEDURAL HISTORY

### A. General History

Scott Korn ("the Debtor") filed a voluntary petition for relief under chapter 11 of the

Bankruptcy Code on April 21, 2014. The Debtor engaged Klehr Harrison Harvey Branzburg

LLP ("Klehr Harrison") to represent him. He filed his initial set of bankruptcy schedules and

statements on May 2, 2014. The §341 meeting of creditors was held and concluded on June 3,

2014.

On July 11, 2014, the Debtor filed a proposed chapter 11 plan of reorganization ("the

Initial Plan") (Doc. #92), a proposed Disclosure Statement ("the Initial DS") (Doc. #93) and a

motion for approval of the DS ("the DS Motion") (Doc. #94). A hearing on the DS Motion was

scheduled initially on August 20, 2014 and then continued to October 1, 2014. In the interim,

the Debtor filed an Amended Plan and an Amended DS on August 29, 2014. (Doc. #s 129 &

130).

On July 18, 2014, John Brown ("Brown"), an unsecured creditor, filed a Motion for an

Order Authorizing Discovery and Examinations of the Debtor and Non-Debtors Pursuant to Fed.

R. Bankr. P. 2004. (Doc. #102). Brown's Rule 2004 Motion was granted on July 28, 2014.

(Doc. #114).

On September 24, 2014, another creditor, American Express Bank FSB ("AmEx") filed

an adversary complaint ("the Amex Complaint") requesting a determination that the Debtor's

pre-petition debt of more than $468,000.00 in credit card charges incurred on three (3) credit

card accounts is nondischargeable under 11 U.S.C. §§523(a)(2)(A), (a)(2)(C) and (a)(14A).

(Adv. No. 14-0427, Doc. #1). The AmEx Complaint set in motion the chain of events leading to

the court's decision today.[1]

On September 25, 2014, the day after AmEx filed its adversary complaint, the Debtor

filed an application to employ new bankruptcy counsel, Maschmeyer Karalis, P.C. ("M&K), and

sought expedited consideration of the application.  (Doc. #149).  On the same day, also on an

expedited basis, the Debtor filed an application to retain Asterion, Inc. ("Asterion") as a

valuation expert to assist the Debtor in preparing projections, a liquidation analysis, a valuation

report with respect to the Debtor's business interests and to provide expert testimony. (Doc.

#153).  After a hearing, the court granted both applications.  (See Orders dated October 15,

2014) (Doc. #185, 189).

On October 1, 2014, while its application for appointment was pending, M&K advised

the court that it intended to amend the initial bankruptcy schedules and revise substantially the

amended chapter 11 plan and amended disclosure statement.  Consequently, the court continued

the hearing on the DS Motion to January 7, 2015.

On November 10, 2014, the Debtor filed amended Schedules and an amended Statement

---

[1]      Among the allegations in the AmEx Complaint are:

(1) In the 90 days prior to the commencement of the bankruptcy case, the Debtor
incurred more than $335,00.00 in credit card charges for goods and services
including various luxuries; and

(2) In the twelve (12) days between the entry of $2.4 million state court jury
verdict in favor of Brown and against the Debtor and the commencement of
this bankruptcy case, the Debtor incurred more than $275,000.00 in credit
card charges, largely for luxury items.

(Amex Complaint ¶¶16, 20, 61-62).

of Financial Affairs (collectively, "the Amended Schedules"),[2] containing substantial, material

additions to the prior disclosures.  (Doc. #'s 209, 210).

On November 18, 2014, the Debtor filed another amended plan ("the Second Amended

Plan") and disclosure statement ("the Second Amended DS").  (Doc. #'s 237, 237).[3]  As

promised by the Debtor's new counsel, the Second Amended Plan substantially revised the prior

filed proposed chapter 11 plan.

## B.  History of the Motion

On October 6, 2014, less than two (2) weeks after the AmEx Complaint was filed, Brown

filed the Motion.  (Doc. #178).  With new counsel, the Debtor filed a response to the Motion on

October 31, 2014.  (Doc. #201).

The court held an evidentiary hearing on the Motion on November 19 and 24, 2014.  Two

(2) witnesses testified: (1) the Debtor and (2) Asterion's principal, Stephen J. Scherf, CPA, who

testified as an expert valuation witness.[4]

No party in interest nor the U.S. Trustee requests dismissal of the case. Brown has

withdrawn his request for appointment of a trustee and limits his request to conversion of the

---

[2]       In reality, there have been several filed  revisions to the Schedules.  For simplicity, I will
refer to the amended documents, including the amended SOFA and Schedule B filed on November 18,
2014 (doc. #'s 233, 234), as the "Amended Schedules."

[3]       These filings were labeled "Amended Plan" and "Amended Disclosure Statement," but
should have been labeled "Second Amended Plan and "Second Amended Disclosure Statement" because
the Debtor filed an amended chapter 11 plan and amended disclosure statement on August 29, 2014.

[4]       Scherf is, among other things, a Certified Valuation Analyst and a Certified Distressed
Business Analyst.  (Ex. D-3 at 3).

case to chapter 7.  The U.S. Trustee supports Brown's request for conversion of the case.  In

response, the Debtor argues that even if "cause" exists for the court to grant some relief under 11

U.S.C. §1112(b), the court should not convert the case, but instead, should appoint an examiner

with expanded powers.

Brown, the Debtor and the UST all submitted post-hearing memoranda in support of their

positions, the last of which was filed on December 8, 2014.[5]

---

[5]      Prior to the hearing, four (4) parties filed short, written submissions opposing the Motion
and requesting that the court permit the Debtor to continue his effort to reorganize under chapter 11.
(Doc. #'s 202, 205, 207 and 231).  These parties were:

> (1) Flaster Greenberg, a law firm that represented the Debtor pre-petition and
> asserted that it is a party in interest (even though it was not listed as a
> creditor in the Debtor's original or amended schedules);

> (2) JN Holding Services Corp., a creditor listed in the Debtor's Amended
> Schedule F as holding an unsecured claim of almost $1.5 million;

> (3) Richard Maffezzoli, a creditor listed in the Debtor's Amended Schedule F as
> holding an unsecured claim of $116,000.00;

> (4) Lightman and Manochi, another law firm that represented the Debtor pre-
> petition and is listed in the Debtor's Amended Schedule F as holding an
> unsecured claim of $5,000.

The attorney for another creditor, Citibank, which (according to the Debtor's Amended
Schedule F holds an unsecured claim of $5.25 million), attended the hearing on the Motion as an
observer.  At the conclusion of the hearing, Citibank's attorney advised the court that it, too, opposed the
appointment of a trustee or conversion of the case.

Thus, the parties opposing the Motion hold scheduled claims totaling just under $6.9
million, more than one-half of the total amount of general unsecured claims listed in the Amended
Schedule F is approximately $11.8 million..  Brown's claim (disputed by the Debtor) is $2.4 million.

Obviously, there is some meaningful support for the Debtor's position in the creditor
constituency.  However, the significance of this creditor support is diluted by the facts that JN Holding
Services appears to be an insider and Citibank's claim is a guaranty claim that is secured by assets of
another business entity or entities.

## III.  FINDINGS OF FACT

I make the following findings of fact based upon the testimonial and documentary evidence presented at trial.  In making these findings, I have considered the demeanor of the witnesses, the plausibility of their testimony, the existence of corroborating circumstantial, testimonial or documentary evidence and the totality of the evidentiary record.

### A.  Debtor's Assets and Debts as Disclosed in the Amended Schedules

### 1.  real property

1.    The Debtor is an individual who resides at 1233 Meadowbank Road, Villanova, Pa ("the Residence"), with his spouse, Arlene Korn, and three (3) children, ages 20, 19 and 16.  (Ex. Brown-6, Schedule J).[6]

2.    The Debtor owns two (2) pieces of real property (collectively, "the Properties") with his spouse as tenant by the entireties:

    a.    the Residence; and

    b.    a second (vacation) property located at 160 North Lake Drive, Lake Harmony, PA ("the Lake Harmony Property").  (Id., Schedule A).

3.    The Debtor claims he does not know the current value of either of the Properties.  (Id.).

4.    The Residence is subject to two (2) mortgages securing debts in excess of $4 million:

    a.    Ocwen Loan Servicing ("Ocwen") holds a first mortgage, securing a debt in excess of $3.5 million; and

---

[6]    Schedule J does not identify the Debtor's spouse name or indicate that she resides with the Debtor.  However, in Schedule I, the Debtor included his spouse's income as part of his income and there was no suggestion in his testimony that she maintains a separate household.

      b.   Fidelity National Title Insurance Co. ("Fidelity") holds a second mortgage, securing a debt of $500,000.00.

(Id., Scheduled D).

5.     The Lake Harmony Property is subject to three (3) mortgages, securing debts of almost

$500,000.00.

      a.   OneWest Bank, FSB ("OneWest") holds a mortgage, securing a debt of approximately $328,500.00; (Compare id. with, Claim No. 22); and

      b.   Bryn Mawr Trust ("BMT") holds two (2) junior mortgages, securing debts in the aggregate of approximately $170,000.00, (Ex. Brown-6, Schedule D);


## 2.  personal property

6.     The Debtor has disclosed an interest in personal property, including but not limited to:

      a.   Cash in the amount of $214,000.00;

      b.   Checking accounts totaling approximately $54,000.00;

      c.   an IRA valued at approximately $122,000.00;

      d.   a life insurance policy with a cash surrender value of approximately $200,000.00;

      e.   an interest in an irrevocable trust in the state of Delaware valued at $985,000.00;

      f.   a brokerage account valued at approximately $750,000.00 (which is secured by a debt to Meridian Bank);

      g.   household goods and furnishings valued at $60,000.00;

      h.   three (3) motor vehicles (2014 Porsche Cayman, 2014 Porsche 911 Carrera and 2009 BMW X3) valued in the aggregate of approximately $200,000.00;

      i.   a 2007 21 foot ski boat and two (2) wave runners valued at almost $20,000.00.

(Id., Schedules B, D).

7.     According to the Amended Schedules, the aggregate value of the Debtor's interest in

personal property is almost $2.65 million.  (Id., Schedule B).[7]

8.      The Debtor has claimed as exempt, personal property totaling more than $1.6 million in

value.  (Id., Schedule C).


### 3. business interests

9.      The Debtor holds an interest in more than twenty (20) business entities, all of which he

valued as either $0.00 or unknown.  (Id., Schedule B).

10.    At least three (3) of those business entities are active and provide the Debtor with most of

his current personal income: Bengal Converting Services, Inc. ("Bengal"), Monterey

Leasing, L.P. ("Monterey") and the Korn Group ("Korn Group").  (Id.; Debtor's

Testimony).[8]

11.    Bengal is in the business of paper sales and converting services and has been operating

since 1993.  (Debtor's Testimony; Ex. D-2 at ¶6.1).

12.    Korn Group owns the building in which Bengal Operates.  (Debtor's Testimony; Ex. D-2 at

---

[7]      In Schedule B, the Debtor stated that the brokerage account referenced there, see Finding of Fact No. 6.f, supra, was "[l]iquidated on May 2, 2014 to pay the secured claim of Meridian Bank."  At trial, the Debtor explained that the $214,000.00 in cash disclosed in Schedule B, see Finding of Fact No. 6.a., was net balance remaining after the liquidation of the account and the payment of the Meridian secured debt.  Thus, the Debtor no longer has the $750,000.00 brokerage account, but does have $214,000.00 in cash.  See Findings of Fact Nos. 28-31, infra.  As a result, his disclosure of personal property of $2.65 million is overstated by more than $500,000.00.


[8]      The notes of testimony were not transcribed.  The Bankruptcy Code mandates that the court issue its ruling on the Motion promptly.  See 11 U.S.C. §1112(b)(3) (court must rule within 15 days after commencement of hearing under §1112(b), unless the movant expressly consents to a continuance or there are "compelling circumstances" that prevent the court from ruling within the time deadline).  Due to the statutory time constraints, I am citing only generally to testimony of the witnesses based on my recollection and personal notes, rather than citing to the digital record.

¶6.1).

13.    Monterey leases equipment to Bengal.  (Debtor's Testimony; Ex. D-2 at ¶6.1).[9]


### B.  Debtor's Income and Expenses as Disclosed in the Amended Schedules

14.    Since the commencement of the bankruptcy case, the Debtor has been drawing

approximately $15,000.00 per month from his businesses.  (See Exs. B-15 to B-20).[10]

15.    In addition, the Debtor's spouse draws a net salary from Bengal of approximately

$3,200.00 per month.  (Ex. Brown-6; Debtor's Testimony).

16.    The Debtor's monthly expenses total approximately $17,350.00, including:

   a.   $10,400.00 per month for mortgage payments, taxes and insurance on the
        Properties, **exclusive of the debt service on the $3.5 million first mortgage on
        the Residence**, (Schedule J, lines 4, 5, 20);[11]

---

[9]      In ¶6.1 of the DS (Ex. D-2), the Debtor referred to two (2) other entities: (1) Korn Group
I, LLC; and (2) MLGP-LLC ("MLGP").

         The DS describes Korn Group I as an entity that "rent[s] commercial space," (presumably
in same building in which Bengal operates). The Debtor does not disclose any personal income as derived
from that entity.

         Curiously, even though MLGP is described in the DS (as well as in Debtor's Amended
Schedule B (Ex. Brown-6)) as an operating entity, the DS does not describe its function.  Nor has the
Debtor disclosed any income as being derived from MLGP.  The Debtor reference the entity in his
testimony.


[10]      The draw as shown in the Debtor's monthly operating reports is roughly equivalent to the
monthly distributions disclosed by the Debtor on Schedule I.  (Ex. Brown-6).


[11]      During the hearing, the Debtor acknowledged that he had not made any payments on the
Ocwen mortgage for quite some time, perhaps several years.  At no time has the Debtor disclosed the
contractual monthly debt service on the first mortgage on the Residence.

    b.   $3,500 per month for his children's educational expenses;

    c.   $500.00 per month for insurance for the Debtor's automobiles.[12]

### C.  The Brown Litigation

17.    In December 2009, the Debtor, his spouse and a number of his business entities, including

    Bengal and Monterey, were named as defendants in a lawsuit brought by John Brown in

    the Court of Common Pleas, Philadelphia County, docketed at No. 09-12-02419..

18.    On April 9, 2014, a jury returned a verdict in favor of Brown and against the Debtor in the

    amount of approximately $2.4 million ("the Brown Jury Verdict").  (Ex. Brown-22, at 23;

    Plan ¶6.4).[13]

19.    The entry of the Brown Jury Verdict precipitated the Debtor's bankruptcy filing on April

    21, 2014.  (Plan ¶6.4).[14]

---

[12]    This amount appears to be seriously understated for insuring two (2) brand new Porsche automobiles plus a 2009 BMW.

[13]    The Brown Jury Verdict was entered on the state court docket on April 14, 2014.  But, the docket indicates that the verdict was returned on April 9, 2014.  (Ex. Brown 22, at 23).

    The state court docket also reflects that the CP court granted the defendants' motion for a nonsuit at trial with respect to claims for fraud and unjust enrichment and that the jury verdict was based on a breach of contract theory.  (Ex. Brown 22, at 22).  The state court docket does not indicate that the Brown Jury Verdict drew any distinction among the defendants.  Thus, it appears that the verdict also was entered against Bengal, Monterey and the Debtor's spouse.

[14]    Notwithstanding the Brown Jury Verdict, the Debtor maintains that he has claims against Brown and Brown's business entities for, inter alia, tortious interference with prospective economic advantage, civil conspiracy, and defamation arising from the Debtor's dealings with an entity called Iggesund Paperboard.  (See Debtor's Second Amended Plan ¶8.1.2) (Doc. #236).  There may be some validity to the Debtor's contention, at least insofar as the Brown Jury Verdict has not been reduced to a

(continued...)

**D.  The Debtor's Transactions Between April 9, 2014 and April 21, 2014**

20.    In the twelve (12) day period between the entry of the Brown Jury Verdict and the filing of

his chapter 11 bankruptcy petition, the Debtor used his three (3) separate AmEx credit card

accounts to make more than $365,000.00 in purchases, including:

    a.  more than $202,000.00 at a Porsche/Audi dealership for two (2) 2014 Porsche
automobiles, see also Finding of Fact No. 6.h., supra;

    b.  more than $26,000.00 at a Honda dealership for the purchase of a 2009 BMW
automobile, see id.

21.    The Debtor titled the vehicles in joint names with his spouse.

**E.  Omissions in the Debtor's Initial Bankruptcy Schedules and Statements**

22.    The Debtor filed his initial set of bankruptcy schedules ("Initial Schedules") and statements

on May 2, 2014.

23.    In his Initial Schedule B, the Debtor failed to disclose his interest in, inter alia:

    a.  a collateralized investment account of approximately $750,000.00;[15]

    b.  claims for tax refunds in excess of $32,000.00;

    c.  the household furnishings (later valued at $10,000.00) located at the Lake

---

[14](...continued)
judgment, much less a final judgment no longer subject to appeal.  Earlier in the case, the court granted
Brown relief from the automatic stay to permit the state court to adjudicate the pending post-trial motions.
(See Doc. #76).

[15]      This is the account described in n.7, supra.  See also Findings of Fact Nos. 28-31, infra.

Harmony Property;

d.  a safe deposit box;

e.  the three (3) automobiles (2 Porsches and the BMW) purchased less than two (2) weeks before the bankruptcy case was filed;[16]

f.  a 21 foot ski boat and two (2) wave runners;

g.  interests in a number of business entities.

(Compare Ex. Brown-2, Initial Schedule B with, Brown-6, Schedule B).

24.  In his Initial Schedule F, the Debtor failed to disclose the existence of a number of creditors holding claims exceeding $1.5 million, including, inter alia:

a.  Meridian Bank ($425,000.00);

b.  U.S. Small Business Administration ($668,000.00);

c.  Richard D. and Mary C. Maffezoli ($116,000.00);

d.  Tavia Gordon ($500,000.00);

e.  Arrow Pool Service (10,640.92);

f.  Moss A. Jackson, Ph. D ($3,475.00).

(Compare Ex. Brown-2, Initial Schedule F with, Brown-6, Schedule F).

25.  In the his initial Statement of Financial Affairs ("Initial SOFA"), the Debtor failed to disclose certain pre-petition asset transfers, including, inter alia:

a.  the transfer of 2013 Cadillac Escalade to his spouse on April 17, 2014 (four (4) days before he filed his bankruptcy petition);

b.  the transfer into joint ownership of the two (2) Porsches and BMW automobile purchased in the twelve (12) day period between the Brown Jury Verdict and the

---

[16]    In the initial Schedule B, the Debtor represented that he did not own an automobile.  He disclosed only his ownership of a 2000 Harley Davidson motorcycle.  (Ex. Brown 2, Schedule B.25).

commencement of the bankruptcy case;

(Compare Ex. Brown-3, Initial SOFA with, Brown-7, Amended SOFA).


## F.  Other  Post-Petition Conduct

### 1. use of AmEx accounts

26.    After commencing his bankruptcy case, the Debtor continued to use his AmEx credit cards,

incurring more than $150,000.00 in charges, largely for business expenses of Bengal.  (Ex.

Brown-24).

27.    These charges are not shown as accounts receivables or loans from the Debtor to Bengal on

his monthly operating reports.


### 2.  liquidation of brokerage account and failure to utilize DIP account

28.    On May 9, 2014, the Debtor liquidated a brokerage account and paid off the claim of

Meridian Bank that was secured by the brokerage account.

29.    The Debtor liquidated the account and paid off the pre-petition debt without notice to any

party in interest and without court approval.

30.    As a result of the liquidation of the brokerage account and the satisfaction of the Meridian

secured debt, the Debtor received net proceeds of approximately $214,000.00 in the form

of cash.

31.    Rather than place the $214,000.00 in a debtor-in-possession account, the Debtor placed the

cash in his safe.

### 3. use of unapproved professional

32.   On May 9, 2014, the Debtor filed an Application to Employ Archer Tax & Financial

Group, P.C. ("the Archer Group") as his accountant in this chapter 11 case.  (Doc. #57).

33.   The application was granted by order dated May 21, 2014, which provided that "Archer

[is] to be paid at such compensation as the Court shall allow, only after approval of an

application in accordance with In re Busy Beaver, 19 F.3d 833 (3d Cir. 1994)."  (Doc.

#72).

34.   In April and May 2014, the Debtor paid the Archer Group compensation of $4,000.00, (see

Ex. Brown-24, Account -2006 at 4-5), without prior court approval in violation of the terms

of the court's appointment order and the Bankruptcy Code.  (See Doc. #72; 11 U.S.C.

§§330, 331).

35.   Although the Archer Group was authorized to act as the Debtor's accountant in this chapter

11 case, the Debtor has not been using its services.  Instead, Frank Barrett, Bengal's in-

house accountant, assisted him in preparing his amended schedules, statement of financial

affairs and monthly operating reports.  (Debtor's Testimony).

### 4. closure of safe deposit account

36.   On October 29, 2014, a few weeks after Brown filed the Motion, the Debtor closed his safe

deposit box.  (Ex. B-7, ¶12).

37.   No one accompanied the Debtor to the bank when he did so.[17]

---

[17]      At the hearing on the Motion, the Debtor claimed that the bank manager was present when accessed the box and that the box was empty.  He did not explain why he chose to close it when he did.

(continued...)

### G. Repetition of Omissions at the §341 Hearing

38.   The Debtor attended the §341 hearing on June 3, 2014.

39.   At the §341 hearing, when directly asked whether he owned any vehicles other than the

2000 Harley Davidson, <u>see</u> Finding of Fact No. 23.f. & n.16, <u>supra</u>, the Debtor denied

owning any automobiles.[18]

### H. Repetition of Omissions in the Initial Plan and Disclosure Statement

40.   On June 11, 2014, the Debtor filed the Initial Plan and the Initial DS.

41.   On August 29, 2014, the Debtor filed an Amended Plan and an Amended DS.

42.   The Initial Plan, Amended Plan, Initial DS and Amended DS all also omitted the disclosure

---

[17](...continued)

[18]     The colloquy was as follows:

> Q.  I also, I also noted that on your list of property, you didn't include any other cars [besides the Harley Davidson and a leased Honda].
>
> A.  Excuse me?
>
> Q.  You didn't include any other cars on the list of property.
>
> A.  No. Why would I have any other cars on the list of property?
>
> Q.  I'm asking the question, do you have any other cars?
>
> A.  **No, I don't have any other cars**.
>
> Q.  The only other vehicle you have is the Harley?
>
> A.  **The only other vehicle that I have is a Harley, that's correct**.

(Ex. Brown-40, at 35-36) (emphasis added).

of assets, debts and pre-petition transfers described in Findings of Fact Nos. 23-25.

43.    The Debtor did not correct most of the omissions in his bankruptcy schedules until

November 10, 2014, when he filed amended schedules and an amended Statement of

Financial Affairs.  (see Doc. #'s 209-10).

44.    The Debtor corrected the omissions in the Initial Plan, Amended Plan, Initial DS and

Amended DS when he filed the Second Amended Plan and the Second Amended DS on

November 18, 2014.  (See Doc. #'s 236-237).

45.    The Debtor made the corrections of the omissions only after the Amex Complaint brought

some of the deficiencies to light and after Brown filed the Motion.


## I.  Proposed Plans

46.    The main elements of the Initial Plan, as amended on August 29, 2014, (Doc. #129) were

as follows:

    a.  Modification of the Ocwen first mortgage on the Residence, bifurcating it into a
secured claim of $1.5 million to be amortized over forty (40) years.

    b.  Transfer of the Lake Harmony Property to BMT, subject to an allowed secured
claim held by IndyMac Mortgage Services.

    c.  Annual distributions, commencing on the effective date, for nine (9) years,
resulting in a distribution of 25% of the allowed general unsecured claims, to be
funded by the liquidation of certain exempt property (not identified) and income
derived from the Debtor's businesses;

    d.  Debtor's retention of control over all avoidance actions.

47.    The main elements of the Second Amended Plan, filed with the assistance of the Debtor's

new counsel, M&K, on November 18, 2014, (see Doc. # 236), are as follows:

    a.  Pursuit by the Debtor of claims against Ocwen, with payment of any amount

determined to be owing on the $3.5 million claim to be made "outside the plan."

b.   Treatment of Fidelity's second mortgage claim against the Residence as an
unsecured claim pursuant to 11 U.S.C. §506(a).

c.   Payment of OneWest's mortgage claim against the Lake Harmony Property from
the proceeds of the sale of the property.

d.   Payment of BMT's mortgage claim against the Lake Harmony from the proceeds
of the sale of the property.

e.   Funding of the Plan in the amount of $1.15 million over five (5) years from the
Debtor's net income,[19] plus a "new value" contribution of $250,000, derived from
Exempt Property.[20]

h.   Annual plan distributions to general unsecured creditors, commencing thirty (30)
days after the effective date in the following amounts: $50,000, $104,000,
$205,500, $230,000, $218,600, resulting a payments totaling at least $808,100.00,
representing a dividend of 6.78%.  (Second Amended DS, Ex. D-2 at 2).

j.   Distribution to general unsecured creditors of the proceeds from his litigation
against Brown and Brown's business entities.  (See n.14, supra).

k.   Extinguishment of all avoidance actions, provided that the Debtor and his spouse
transfer their joint interest in the two (2) Porsches, the BMW and Bengal to the
Debtor on or before the effective date.

---

[19]      The Plan states that the amount was calculated by subtracting the Debtor's projected
expenses from his projected net income (after taxes) over the five (5) year period.  He qualifies the
payment commitment by stating that it is subject to review and approval by the Bankruptcy Court at the
time of the Confirmation Hearing and the amount approved by the Bankruptcy Court shall control under
the Plan."  (Plan ¶5.2) (Doc. #236).

[20]      $214,000 of the proposed $250,00.00 in new value is derived from the segregated DIP
account.  The Plan states:

> Between the projected disposable income (net of income taxes and Schedule J
> expenses) of $1,151,445 for the 5 year term of the Plan and the new value
> contribution of $250,000, the total amount of $1,401,445 will be available to
> fund the Plan over its 5-year term.

(Plan ¶5.3) (Doc. #236).

### J. Debtor's Scienter

48.   The Debtor acted either intentionally or recklessly in filing schedules and statements that

had massive omissions.

## IV.  DISCUSSION

### A.  11 U.S.C. §1112(b) - Overview

Brown seeks conversion of this chapter 11 case to chapter 7 pursuant to 11 U.S.C.

§1112(b).  Section 1112(b)  provides, in pertinent part:

> (1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests, of creditors and the estate.
>
> (2) The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtors or any other party in interest establishes that —
>
>> (A)   there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
>>
>> (B)   the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A) —
>>
>>> (i) for which there exists a reasonable justification for the act or omission; and
>>>
>>> (ii) that will be cured within a reasonable period of time fixed by the court.

Application of §1112(b) is a two-step process.  The initial burden is on the movant to prove by a preponderance of the evidence that there is "cause" for either conversion or dismissal of the chapter 11 case, whichever is in the best interests of creditors and the estate.  Once cause is found, the burden shifts to the opposing party to show why dismissal or conversion would not be in the best interests of the estate and the creditors.[21]

The Code provides sixteen (16) examples of "cause" for relief under §1112(b) in §1112(b)(4).[22]   The examples are "illustrative and not exhaustive."[23]

---

[21]    E.g., In re Costa Bonita Beach Resort, Inc., 513 B.R. 184, 195 (Bankr. D.P.R. 2014); accord In re Carrreras, 2013 WL 7118201, at *5 (B.A.P. 1st Cir. Oct. 24, 2013); In re Grasso, 497 B.R. 448, 455 (Bankr. E.D. Pa. 2013); In re Brewery Park Associates, L.P., 2011 WL 1980289, at *15 (Bankr. E.D. Pa. Apr. 29, 2011).


[22]    Section 1112(b)(4) states that "cause" includes:

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

> (B) gross mismanagement of the estate;

> (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;

> (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;

> (E) failure to comply with an order of the court;

> (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

> (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under Rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

> (H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(continued...)

-19-

The court's determination regarding the existence of cause under §1112(b)(1) is a factual

inquiry in which the court may exercise its discretion.[24]  Once "cause" is established, the court's

discretion is limited; it must grant some form of relief unless §1112(b)(2) applies.[25]

Under §1112(b)(2), the court retains discretion in evaluating whether there are "unusual

_____

[22](...continued)

(i) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required under chapter 123 of title 28;

(L) revocation of an order of confirmation under section 1144;

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

[23]      In re Ramreddy, Inc., 440 B.R. 103, 112 (Bankr. E.D. Pa. 2009) (quoting In re Corinthian, LLC, 2009 WL 363165, at *4 (Bankr. E.D. Pa. Feb.11, 2009) and citing other cases).

[24]      E.g., In re Creekside Sr. Apts., L.P., 489 B.R. 51, 60 (B.A.P. 6th Cir. 2013) (citing cases).

[25]      E.g., Costa Bonita Resort, 513 B.R. at 195; In re Kholyavka, 2008 WL 3887653, at *3 n.9 (Bankr. E.D. Pa. Aug. 20, 2008); In re Gateway Access Solutions, Inc., 374 B.R. 556, 560 (Bankr. M.D. Pa. 2007).

circumstances" that establish that conversion or dismissal "is not in the best interests of creditors

and the estate."[26]  However, in addition to establishing "unusual circumstances," the text of the

statute commands that the party opposing conversion or dismissal must establish three (3)

elements before a case may remain in chapter 11 after a finding of cause for conversion or

dismissal.[27]

When all of the elements of §1112(b)(2) are broken down and aggregated, §1112(b)(2)

defense to conversion or dismissal of a chapter 11 case actually consists of six (6) components:

> (1)  "unusual circumstances" exist;

> (2)  conversion or dismissal "is not in the best interests of creditors and
> the estate;"

> (3)  there is a reasonable likelihood of confirmation of a plan within any
> time period mandated by the Code or, otherwise within a reasonable
> time;

> (4)  the grounds for dismissal for "cause" do not include those set forth in
> §1112(b)(4)(A);[28]

> (5)  there is a reasonable justification for the act or omission of the debtor;

---

[26]      See Costa Bonita Resort, 513 B.R. at 195; In re Triumph Christian Center, Inc., 493 B.R.
479, 496 (Bankr. S.D. Tex. 2013).

[27]      See, e.g., In re Ashley Oaks Development Corp., 458 B.R. 280, 285 (Bankr. D.S.C.
2011).

[28]      As provided in the plain language of the Code, courts have held that if one of the grounds
for dismissal or conversion is §1112(b)(4)(A) (substantial or continuing loss to or diminution of the estate
and the absence of a reasonable likelihood of rehabilitation), the §1112(b) inquiry ends; the case must be
converted or dismissed.  See In re Burgess, 2013 WL 5874616, at *3 (Bankr. N.D.W. Va. Oct. 30, 2013);
In re Visicon Shareholders Trust, 478 B.R. 292, 316 (Bankr. S.D. Ohio 2012); In re Brutsche, 476 B.R.
298, 306 (Bankr. D.N.M. 2012); In re Landmark Atlantic Hess Farm, LLC, 448 B.R. 707, 717 (Bankr. D.
Md. 2011).

and

(6)  the act or omission may be cured within a reasonable period of time.


### B.  11 U.S.C. §1112(b)(1)

In this case, my conclusion that there is "cause" for relief under 11 U.S.C. §1112(b)(1) is

predicated largely on my finding that the Debtor acted either intentionally or recklessly in

violating his financial disclosure obligations as a chapter 11 debtor.  (See Finding of Fact No.

47).  Because this finding is critical, it warrants some further explanation.


### 1.

The Debtor offered two (2) explanations for the glaring omissions from his initial

bankruptcy schedules and statements.  Initially, he tried to blame his former counsel, Klehr

Harrison for either failing to properly counsel him regarding the required disclosures or failing to

include all of the information in the schedules that he provided to counsel in the preparation

process prior to their filing.  (Even with this explanation, he admitted that he did not carefully

review the schedules and statements before he verified them).  However, the Debtor withdrew

this asserted excuse after it became clear that blaming counsel would open the door to scrutiny of

his communications with counsel.

Withdrawal of the "reliance on counsel" theory left the Debtor with one other

explanation for his failure to comply with his statutory duty under 11 U.S.C. §512(a)(1).  While

his actual testimony was not especially articulate, he suggested that an anxiety disorder,

exacerbated by (1) the shock he suffered when the Brown Jury Verdict was entered and (2) time

constraints in the preparation of the bankruptcy schedules and statements, prevented him from

paying the necessary attention to detail to insure that the disclosures were substantially accurate.

As finder of fact, I do not find the Debtor's explanation credible for many, independent

reasons, including:

> (1) His convenient, self-serving testimony was not corroborated by any other evidence that would suggest that the asserted emotional disorder prevented an otherwise self-proclaimed, successful businessman from fulfilling the most basic of bankruptcy debtor duties.
>
> (2) He was represented by competent counsel at the outset of the case who, most likely, impressed upon him the need for honesty, accuracy and completeness in compiling the financial disclosures filed under oath.
>
> (3) It is not believable that the Debtor forgot about the three (3) luxury cars that he purchased less than one (1) month before he filed his schedules, particularly because the Debtor is passionate about one (1) of the two (2) Porsches that he purchased.[29]
>
> (4) Sufficient time passed between the entry of the Brown Jury Verdict and the filing of the schedules and statements to permit the Debtor to control his asserted anxiety.  He presented no reasonable explanation why he continued to fail to disclose the existence of the recently purchased automobiles at the §341 hearing, almost two (2) months after the Brown Jury Verdict, or allowed all of the omissions to be repeated in the Initial DS, three (3) months after the Brown Jury Verdict.[30]

---

[29]    At his deposition, the Debtor testified:

> A:  My wife's other car was coming off lease  . . .  she was shopping up a Porsche, she wanted this Cayman.  I was going to get her the Cayman, I got her the Cayman.
>
> **I just happened to walk in there and fall in love with a . . . black 911 Carrera**  . . . .  And when they took me up here and I saw this and I drove this 7-speed, you know, Carrera, that is just my perfect color, **I love that car**.

(Ex. Brown 49, at 234-25) (emphasis added).


[30]    I recognize that the passage of time might not be sufficient if an individual's

(continued...)

(5) He made no effort to correct the omissions until after they were discovered by his creditors.

(6) His retention of the net proceeds from the liquidation of the brokerage account (after payment of the Meridian secured claim) in cash, rather than depositing the funds into the DIP account and his closure of his safe deposit box after the filing of the AmEx Complaint and the Motion are both highly suspicious, totally at odds with spirit of transparency required in the bankruptcy reorganization process and far more consistent with a dishonest state of mind (or, at a minimum, a self-centered disregard of the Debtor's duties to others in the bankruptcy reorganization process).

On this record, once the Debtor's excuse is disregarded, I may infer that the Debtor deliberately failed to disclose material information from his creditors when he filed his bankruptcy schedules and statements. However, to decide the Motion, I need not go so far. At a minimum, his conduct was reckless. See generally Bullock v. BankChampaign, N.A., 133 S. Ct. 1754, 1757 (2013) (for purposes of 11 U.S.C. §523(a)(4), a debtor acts recklessly by consciously disregarding or willfully turning a blind eye to a known risk that his or her conduct will violate a fiduciary duty).

**2.**

Given my factual finding regarding the Debtor's scienter, I conclude easily there is "cause" to convert the case under §1112(b)(1).

The Debtor, while acting as debtor-in-possession ("DIP") and as a fiduciary to his

---

[30](...continued)
psychological problem is sufficiently severe. However, on this record, consisting solely of the Debtor's testimony on the subject, I am not convinced that the Debtor's problem was so severe that he was incapable of realizing that he was concealing material financial information from creditors and the court.

creditors,[31] acted either deliberately or recklessly in failing to disclose the existence of valuable estate assets and substantial pre-petition transfers to insiders that may be subject to avoidance. He continued to conceal that information from his creditors for several months.  An inexcusable failure to make numerous, material financial disclosures  supports a finding of cause for dismissal, conversion or the appointment of a trustee under §1112(b).[32]

Furthermore, the Debtor's problematic conduct went beyond multiple erroneous disclosures.  He entered into an unauthorized, post-petition, out of the ordinary course transaction (payment of the pre-petition Meridian Bank secured claim) and made an unauthorized payment to a retained professional (the Archer Group).  He also employed another professional (Frank Barrett), without authorization, to assist him in fulfilling his obligations as

---

[31]     See, e.g., In re Marvel Entertainment Group, Inc., 140 F.3d 463, 471 (3d Cir. 1998).

[32]     See In re Melendez Concrete, Inc., 2009 WL 2997920, at *6 (Bankr. D.N.M. Sept. 15, 2009) ( "**the failures  .   .   . of the Debtor to schedule or disclose substantial claims against insiders until raised by the Bank's motion to convert or dismiss,** failure to timely file the June 2009 monthly operating report, and failure to include an income statement and balance sheet as part of the operating reports for either June or July 2009, together with pre-petition conduct on the part of the Debtor, discrepancies between the Debtor's equipment list and the equipment list for the insurance policy, **and the Debtor's lack of care in producing documents** required by the Rule 2004 order, **constitute cause to dismiss or convert**) (emphasis added); see also In re Stokes, 2009 WL 3062314, at *17 (Bankr. D. Mont. Sept. 21, 2009).

While it is not necessary to ground the finding of "cause" in a specific subsection of §1112(b)(4), see n.22 & accompanying text, supra, the Debtor's failure to provide accurate schedules and statements falls under §1112(b)(4)(F) as an unexcused failure to satisfy timely any filing or reporting requirement.  Simply filing the correct form on time is not compliance with §1112(b)(4)(F), at least where the timely filed documents contain grossly erroneous, material information. "Filing a piece of paper is meaningless if the content is inaccurate, misleading, or wrong, thus the content of these documents is . . . relevant [under §1112(b)(4)(F)]."  In re Tucker, 411 B.R. 530, 532 (Bankr. S.D. Ga. 2009); see also In re Charles Street African Methodist Episcopal Church of Boston, 499 B.R. 66, 115-16 (Bankr. D. Mass. 2013); Hoyle, 2013 WL 210254, at *6-7 (Bankr. D. Idaho Jan. 17, 2013); In re Whetten, 473 B.R. 380, 383 (Bankr. D. Colo. 2012); In re Sanders, 2010 WL 5136192, at *4 (Bankr. D.S.C. Apr. 29, 2010).

DIP.  He retained a large sum of money in cash, rather than placing the funds in his DIP account.

He closed a safe deposit box after the conversion motion was filed and provided no transparency

to the creditor body regarding the contents (or lack thereof) of the box.

Considering both the nature and number of improprieties here, the conclusion is

inescapable that the Debtor had no appreciation of his fiduciary obligations as a chapter 11

debtor.  His conduct fell woefully short of the standards expected of a bankruptcy fiduciary,

making it clear that "cause" exists for relief under §1112(b)(1).

### C.  11 U.S.C. §1112(b)(2)

### 1.

The term "unusual circumstances" is not defined in the Bankruptcy Code.  Many courts

have stated that "unusual circumstances" under §1112(b)(2) involve "conditions that are not

common in most chapter 11 cases."[33]   One court has suggested that the term is limited to

"presently existing conditions or facts, not past events."[34]   Under this view, the fact that a

reorganization case was triggered by alleged pre-petition mismanagement or a contentious

dispute with a creditor does not constitute "unusual circumstances."[35]   Nor does a debtor's claim

---

[33]     In re Orbit Petroleum, Inc., 395 B.R. 145, 148 (Bankr. D.N.M. 2008); accord, e.g.,
Grasso, 497 B.R. at 455;  In re LG Motors, Inc., 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009).

[34]     L & T Machining, Inc., 2013 WL 3368984, at *4 (citing Gateway Access Solutions, 374
B.R. at 564).

[35]     See In re ARS Analytical, LLC, 433 B.R. 848, 865  (Bankr. D. N.M. 2010); Wallace,
2010 WL 378351, at *7.  Cf. In re Pittsfield Weaving Co., 393 B.R. 271, 275 (Bankr. D.N.H. 2008)
(continued...)

that it can manage a liquidation better than a chapter 7 trustee due to its asserted greater expertise generally support a finding of "unusual circumstances."[36]

My review of the case law suggests that "unusual circumstances" is largely "result oriented," a term I do not employ in any pejorative sense in this context.  I use the term to suggest only that, under §1112(b)(2), courts focus on the likely consequences of remaining in chapter 11 or converting the case to chapter 7 and consider what the likely differences would be in the end result under each chapter.  Notwithstanding the existence of "cause" for conversion or dismissal of the case, if the likely outcome for creditors will be vastly superior under chapter 11, courts may find unusual circumstances under §1112(b)(2).[37]

Stated slightly differently, unusual circumstances exist when, despite the existence of cause based prior shortcomings in case administration, (other than those described in §1112(b)(4)(F)), those shortcomings are excusable and chapter 11 offers a convincing prospect

---

[35](...continued)
(unexpected loss of a key customer and debtor's trade creditors continuing to deal with the debtor and suffering losses) (dictum).

[36]      L & T Machining, Inc., 2013 WL 3368984, at *4; Brutsche, 476 B.R. at 306-308.

[37]      See Melendez Concrete, 2009 WL 2997920, at *7 (debtor's assets equal three (3) times the value of the secured debt, making it likely that unsecured creditors would be paid in full in an "orderly liquidation"); Orbit Petroleum, 395 B.R. at 149 (full payment of creditors on effective date); see also In re McTieran, 2014 WL 4723071, at *6 (Bankr. D. Wyo. Sept. 22, 2014) (substantial equity in property plus debtor's credible testimony regarding his improved financial situation following his release from prison).

Perhaps this reflects a pessimistic view of the results usually achieved in most chapter 11 cases.  Regardless whether this glum perception of chapter 11 outcomes is empirically valid, it appears to drive the treatment of §1112(b) contested matters.

that creditors will be paid in full (or in large part, or substantially more than in a chapter 7

liquidation), without the risks of failure typically associated with the implementation of a chapter

11 reorganization plan.

In this case, for two (2) independent reasons, I conclude that Debtor did not satisfy the

standards under 11 U.S.C. §1112(b)(2) to avoid conversion or dismissal.[38]

## 2.

Section 1112(b)(2) requires that there be a "reasonable justification" for the act or

omission that gives rise to a finding of "cause" under §1112(b)(1).  I have rejected entirely the

Debtor's explanation for his unacceptable financial reporting.[39]  I have found the Debtor's

violation of his duties, at a minimum, reckless or, worse still, purposeful.  Either way, his

conduct is inexcusable.  Without a reasonable justification for the Debtor's inadequate

performance as DIP, the case must be converted or dismissed.[40]

## 3.

Further, and more fundamentally, the Debtor has not established that this is case is

---

[38]    The two (2) grounds discussed below are sufficient and it is unnecessary to consider the
other reasons Brown has presented for rejection of the Debtor's §1112(b) defense.

[39]    See Part IV.B., supra.

[40]    See In re L & T Machining, Inc., 2013 WL 3368984, at *4 (Bankr. D. Kan. July 3, 2013);
Hoyle, 2013 WL 210254, at *14; Whetten, 473 B.R. at 385; In re RIA, LLC, 2010 WL 1418349, at *1-2
(Bankr. D.D.C. Apr. 8, 2010); In re Wallace, 2010 WL 378351, at *7 (Bankr. D. Idaho Jan. 26, 2010).

unusual in either common meaning of the term or in the specialized way it is employed in §1112(b)(2), such that it would be appropriate to disregard the existence of cause of conversion of the case.

The Debtor's bankruptcy filing was precipitated by the Brown Jury Verdict.  Chapter 11 filings regularly occur after a major litigation setback.  There is nothing unusual about that.

Further, the fact that the Motion was precipitated and is grounded in difficulties of the Debtor's own making  – his failure to comply with the financial reporting requirements of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure –  cannot be characterized as unusual.  The plethora of reported cases under §1112(b)(4)(F) makes that clear enough.

But perhaps most importantly, the Debtor has not demonstrated that chapter 11 is certain enough to provide a relatively risk-free, clear path to a materially superior result for creditors than a conversion to chapter 7.[41]

In the Second Amended Plan and Second Amended DS, the Debtor proposes to treat Ocwen's $3.5 million secured claim in a manner that is not clearly comprehensible.  The Debtor proposes to retain the Residence and pay Ocwen "outside of the Plan"  –  a concept that is unexplained.  Apparently, the Debtor's notion is that he will pursue a state law unfair trade practice claim against Ocwen,[42] in the expectation that the litigation will resolve his default.

_____

[41]      To some extent, this consideration implicates the statutory requirement that there is a reasonable likelihood of confirmation of a plan within any time period mandated by the Code or, otherwise within a reasonable time.  See 11 U.S.C. §1112(b)(2)(A).  This is discussed in n.48, infra.


[42]      See Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§201-1, 201.9.2.

(See Plan ¶¶ 3.11, 8.1.1).[43]  Yet, even he does not suggest that his claim will entirely offset the

$3.5 million mortgage claims; the Plan states only that the Debtor's claim's value is "in excess of

$2 million." (Plan ¶8.11).  Even if this facially speculative claim is largely successful, the

Debtor does not explain how he will pay the balance of the claim outside of a reorganization

plan in which he proposed to devote all of his projected disposable income over five (5) years to

pay unsecured creditors.  (See Plan ¶5.2).

 The proposed treatment of the second mortgage on the Residence is equally problematic.

The Second Amended Plan provides that if Fidelity makes the §1111(b) election, it will be paid

from the net proceeds from the sale of the Residence.  However, if the property is to be sold,

there is nothing in the record to indicate that there will be any net proceeds after Ocwen is paid.

As a result, this Plan provision is peculiar and illogical.

 The devotion of almost 60% of the Debtor's net income to debt service, insurance and

taxes on the Debtor's real property (exclusive of his $3.5 million first mortgage on the

Residence!), combined with his failure to address the Ocwen claim in a realistic manner, creates

a strong impression that the Debtor's plan is either a visionary scheme with little chance of

success[44] or is a cynical attempt to maintain a luxurious lifestyle with no belt-tightening, while

paying creditors a relatively paltry distribution.  Either way, termination of the reorganization

---

[43] The unfair trade practice claim is based on issues arising in the servicing of a loan
modification agreement made by its predecessor in interest.

[44] See generally In re Capital Am. Equipm., LLC,  688 F.3d 145, 162 (3d Cir. 2012) (the
bankruptcy court is not bound to clog its docket with visionary or impracticable schemes for
resuscitation) (quotations and citations omitted).

effort is warranted.

Separate and apart from the concerns arising from the Debtor's proposed treatment of the

Residence and the claims against it, the Plan's feasibility is questionable.  The Plan funding is

based largely on distributions that the Debtor expects to receive from his business entities over a

five (5) year period.  The reliability of this revenue source is not sufficiently clear to establish

that the interest of creditors are better served under chapter 11 rather than chapter 7.   As Brown

pointed out in his post-hearing brief,[45] the Debtor's own valuation expert opined that his business

entities are operating with a working capital deficit[46] and have reported losses in calendar year

2014.[47]  While the Debtor testified, with some plausibility, that recent business opportunities

portend an improvement in the financial performance of his businesses, I conclude that

unsecured creditors would bear a meaningful risk of default under any confirmed plan that is

dependent for funding upon the income generated by the businesses.[48]  The risk is significant

---

[45]      (Brown Post-Hearing Brief at 24) (Doc. #249).

[46]      (Testimony of Stephen Scherf).

[47]      According to the financial statement attached to the Second Amended DS, through
September 2014, Bengal, Monterey and the Korn Group have a combined operating income loss of
$107,353.00 and a net income loss before income taxes of $420,084.00.

[48]      In this respect, I assess the feasibility of a proposed plan more strictly under §1112(b)(2)
than I might under 11 U.S.C. §1129(b)(11).

        To be clear, if the request for conversion in this case were based solely on the absence of
a reasonable likelihood of a debtor being able to propose a feasible, confirmable plan, see e.g., 3 Ram,
Inc., 343 B.R. 113, 117-18 (Bankr. E.D. Pa. 2006), it is not obvious that cause for conversion would exist.
                                                                                    (continued...)

enough to undercut the Debtor's contention that creditors are far more likely to be paid more in chapter 11 than under chapter 7.[49]

Finally, the foundation of every chapter 11 reorganization case is that acceptance of the Debtor's plan is in the best interests of the creditors as compared to a chapter 7 liquidation because their distribution is projected to be greater under chapter 11.  An unusual case would be one in which the disparity between the outcomes of the different chapters is stark and substantial.  Here, even if successful, the Plan does not provide a compelling result for unsecured creditors.  It proposes a distribution to unsecured creditors of less than one-half of one percent (0.4213%) on the effective date and a total of less than seven percent (6.8%) to creditors over five (5) years.  This relatively meager proposed distribution does not support a finding of "unusual circumstances" under §1112(b)(2).  The pedestrian level of benefits promised to creditors in chapter 11 combined with the feasibility issues that exist, convince me that the Debtor has not

---

[48](...continued)
At least at a relatively early stage of a case, the problems I have described in a plan such as the Debtor's Second Amended Plan might be remediable.  But, once cause for conversion has been established for other reasons, to find "unusual circumstances" under §1112(b)(2), the Debtor must make a stronger showing of the presumptive benefits, feasibility and confirmability of its proposed plan for reorganization.

[49]      I note one other feasibility issue that the parties have not addressed.  My review of state court dockets in the Brown litigation suggests that the Brown Jury Verdict was entered against Bengal as well as the Debtor personally.  See n.13, supra.  The Debtor's proposed plan is dependent upon Bengal's financial viability and performance.  He has not explained how Bengal will be able to continue to operate if the Brown Jury Verdict is reduced to judgment.  At a minimum, the Brown Jury Verdict increases the risks that the proposed reorganization plan will fail.  A potential solution to this problem is a third party release of Bengal, but, as presently drafted, the Plan does not include such a third party release and there is considerable doubt whether a plan with a third party release that provides for less than a ten percent (10%) distribution to Brown may be approved.  See, e.g., In re South Canaan Cellular Investments, Inc., 427 B.R. 44, 72 (Bankr. E.D. Pa. 2010) (one of the requirements for approval of a third party release is that the plan provides for payment of substantially all of the claims affected by the injunction or release).

met his burden of proving unusual circumstances under §1112(b)(2).

## V.  CONCLUSION

This is a case in which an individual debtor has attempted to use the chapter 11 process to salvage and maintain his pre-petition lifestyle to the greatest extent possible, while paying his creditors the minimum amount he believes is necessary to convince them to support his chapter 11 plan.  By themselves, there is nothing necessarily wrong or unusual about either of those goals.  However, in his attempt to obtain the best possible financial rehabilitation, the Debtor abused the chapter 11 process by concealing material information from his creditors.  And, even after doing so, either because he is persisting in his effort to maximize his financial rehabilitation or because he is genuinely incapable of offering creditors a better plan, the Debtor has presented the creditor body with a proposed chapter 11 plan that is problematic in several respects and that does not offer creditors anything other than what they would expect to receive in any ordinary chapter 11 case.  Under §1112(b)(2), he must do more.

At the risk of oversimplification, several courts have observed that §1112(b)(2) may be invoked when "unusual facts or circumstances demonstrate that the purposes of chapter 11 would be better served by maintaining the case as a chapter 11 proceeding."[50]  The Debtor has not met this burden either "holistically" or under the specific statutory elements set out in §1112(b)(2).  Brown has established cause for relief under 11 U.S.C. §1112(b)(1) and the Debtor has not established the existence of unusual circumstances under §1112(b)(2).

---

[50]      In re Picaho Hills Utility Co., Inc., 518 B.R. 75, 82 (Bankr. D.N.M. 2014) (quoting 7 Collier on Bankruptcy ¶1112.04[3] (Alan N. Resnick, Henry J. Sommer eds., 16th ed. 2008); In re Kent, 2008 WL 5047799, at *6 (Bankr. D. Ariz. Sept. 23, 2008) (same).

For these reasons, the Motion will be granted and this case will be converted from chapter 11 to chapter 7.  An appropriate order follows.

Date: **December 18, 2014**

**ERIC L. FRANK
CHIEF U.S. BANKRUPTCY JUDGE**